**Opinion issued January 15, 2019**



In The

# Court of Appeals

### For The

# First District of Texas

_____

## NO. 01-18-00245-CV

_____

## IN THE INTEREST OF A.J.H., A CHILD

---

### On Appeal from the 314th District Court
### Harris County, Texas
### Trial Court Case No. 2017-00233J

---

### MEMORANDUM OPINION

In this accelerated appeal, appellant, E.H. ("Mother"), challenges the trial court's final decree, entered after a bench trial, terminating her parental rights to her minor child, A.J.H. In three issues, Mother contends that the evidence is legally and factually insufficient to support the trial court's findings (1) that she knowingly placed or knowingly allowed the child to remain in conditions or surroundings which

endanger the physical or emotional well-being of the child, or that she knowingly engaged in conduct, or knowingly placed the child with persons who engaged in conduct, that endangered the child's physical or emotional well-being,[1] (2) that she failed to comply with the provisions of a court order that specifically established the actions necessary to obtain the return of the child,[2] and (3) that termination of her parental rights is in the best interest of the child.[3] She also argues in a fourth issue (4) that the trial court abused its discretion by appointing the Department of Family and Protective Services ["DFPS"] as the child's sole managing conservator instead of herself.[4]

## BACKGROUND

The child, A.J.H., was born in 2015. Mother was not married and no father was listed on his birth certificate. During the course of this proceeding, DNA testing confirmed the identity of A.J.H.'s father, and the father's parental rights were also terminated in a separate trial. The father is not a part of this appeal, though his appeal is also pending in this Court.

---

[1]    TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E)

[2]    TEX. FAM. CODE ANN. § 161.001(b)(1)(O)

[3]    TEX. FAM. CODE ANN. § 161.001(b)(2)

[4]    TEX. FAM. CODE ANN. § 153.131(a)

2

*The July 2016 Hospitalization*

On July 7, 2016, when A.J.H. was a year-and-a-half old, Mother took him to Texas Children's Hospital Urgent Care. According to medical records, A.J.H. presented with vomiting, abdominal pain, and spots on his abdomen. Mother told the medical professional that A.J.H.'s symptoms started on Sunday, July 3rd, after eating a hamburger at McDonald's and continued through the next day. When the vomiting stopped, Mother noticed marks on his abdomen that looked like bruising, his stomach was distended, he seemed uncomfortable, and he was unable to lie on his stomach. A.J.H. also had pharyngitis and was strep-positive. The medical records note a bruise on A.J.H.'s left ear, three "nonblanching spots that appears to look like bruising" on his abdomen, and two "nonblanching spots that appears to look like bruising" on his lower back. The Urgent Care report concluded that the medical professional was "sending [A.J.H.] downstairs for further evaluation of possible abuse due to multiple bruising found on abdomen, lower back and upper left ear."

A.J.H. was transferred to Emergency Care with notes that the treatments recommended by his primary care physician were: "Medication for strep. R/O physical abuse work up." The Emergency Center notes report that, with regard to the bruising, "Mother reports that he had fallen asleep on her coat which has wood buttons and that she thinks he was sleeping on a button . . . . Mother reports that pt

3

has always seemed to bruise easily but it has been worse this week." Again, bruises on A.J.H.'s ear, abdomen, and back were noted, as well as hepatomegaly, or liver swelling. The records include the following plan of care:

> 17 month old with vomiting, abdominal pain, low grade fever and easy bruising, has +strep test, hepatomegaly on exam, concern for coagulopathy, hepatitis, liver failure, possible abdominal injury, malignancy, less likely to be TIP or HSP. Check cbc, liver panel, amylase, lipase, easy bruising panel. Consider US or xray as indicated by lab results.

An ultrasound was done of A.J.H.'s abdomen, and the medical records conclude:

> US abdomen: Hepatomegaly. Possible focal area of fibrosis in the right hepatic lobe. No discrete hepatic mass. Small volume ascites. Gallbladder sludge. Nonspecific urinary bladder debris.

> Spoke to GI, can discharge from GI perspective. Liver enzymes elevated but liver function normal. Follow up in GI clinic as an outpatient. Abdominal and ear bruise not visible anymore. Will treat for strep throat. No concern for abuse at this time.

Discharge instructions dated July 8, 2016 provide: "Amoxicillin per script, follow up in GI clinic. Return to EC if not drinking." The discharge documentation portion of the records provides in part:

> Patient Teaching: Discharge instructions complete WITH medication prescription review[.]

> Discharge Teaching: Patient/Caregiver Verbalizes Understanding; Provided copy of AVS [after-visit summary]; follow-up appointment scheduled[.] Referral to GI[.]

4

*The January 2017 Hospitalization*

In January 2017, Mother left A.J.H. with her live-in boyfriend, Chester Mosely, while she went to work. Mother usually left A.J.H. with her mother, but it was cold outside, and she did not want to have to take A.J.H. on the bus to her mother's home. While Mother was at work, Mosely called and reported that A.J.H. had minor burns. Mother said that she would look at it when she got home from work. While Mother was on her way home from work, Mosely called again and reported that A.J.H.'s skin was peeling off his buttocks. Mother called an ambulance, and A.J.H was taken to Texas Children's Hospital.

The Texas Children's medical records stated that "when asked privately [Mother] denies having concerns about abuse[.]" The hospital noted burns to A.J.H.'s lower back, buttocks, perianal area, and scrotum, and that some blisters were intact, but not on his buttocks. The hospital also noted "[h]yperpigmentation concerning for bruising on torso, check [sic], behind L ear, and R inner thigh." The hospital concluding that there was a "partial thickness burn on buttock, partial thickness burn on right forearm below elbow, elevated liver and pancreas test could reflect injury to abdomen." Texas Children's then ordered A.J.H. transferred to the burn unit at Memorial Hermann Hospital.

The Memorial Hermann Hospital records show that, upon admission, in addition to the burn injuries, A.J.H. had vomited the day before, "after eating apple

5

juice." He also had a scab on his left ear, an abrasion of his right ear, and a scab on the scalp behind the right ear. An examination of the abdomen showed "no masses," but that A.J.H. "cries with palpation but is overall discomfort during examination." He also had "[h]yperpigmented, brown macules to [the] right abdomen." In its assessment, the medical personnel noted that "the burn appears to be an immersion injury and [is] not consistent with the history provided of boyfriend bathing the child." There was no history of trauma to explain the marks on his cheek and abdomen, and that "[i]injury to these areas are uncommon with normal child's play and are concerning for inflicted trauma." A.J.H. also had "very high liver and pancreatic enzymes" and "vomiting and a decreased appetite[.]" After reviewing A.J.H.'s history and physical exam, among other things, a physician concluded:

> This pattern of burn along with the provided history is very concerning for non accidental trauma and we are concerned that the child's elevated liver enzymes and lipase may be the result of abdominal trauma and recommend an abdominal CT for further evaluation. CPS is involved and the child cannot be discharged prior to CPS disposition.

Accordingly, a CT scan was performed and the following information was entered into A.J.H.'s medical records.

> [A.J.H] received an abdominal CT today which showed a Grade 2 liver laceration and abnormalities of his pancreas concerning for subacute or chronic pancreatitis. Given his abdominal bruises and petechiae, [A.J.H.'s] liver laceration is consistent with blunt force trauma to his abdomen. His liver enzymes (AST/ALT) have trended down rapidly from 1197/1907 to 89/107 within 3 days which likely implies recent abdominal trauma. It is unclear at this time whether his pancreatic abnormalities are due to recent or past trauma.

6

We reviewed medical records from the child's ER visit to TCH on 7/7/16 after obtaining a medical release of information from mother. [A.J.H] presented to TCH ER with his mother for vomiting and bruising to his stomach. Bruises were noted on his abdomen, back, and left ear. The child's liver and pancreatic enzymes were also extremely elevated at that visit (AST 693, ALT 1907, Amylase 240, Lipase 2076). An ultrasound was obtained and reported as normal and the child was discharged home with instructions to follow up with GI, though this was never done.

[A.J.H.'s] burn injuries, facial and abdominal bruising and liver injury provides substantial evidence for inflicted trauma. Based on our review of his previous ER visit in July 2016, he had bruising and elevated abdominal trauma labs that were concerning for possible physical abuse. CPS and law enforcement are involved and we will communicate these new findings with the family's case worker. It is not safe to return [A.J.H.] to his previous home environment as he may have been subjected to more than one episode of trauma under the care of his current caregivers.

. . . .

[A.J.H.] must be placed into a safe environment as he is at high risk for life threatening injury in the current environment.

### DFPS Involvement and Criminal Charges against Mosely

DFPS took custody of the child, filed a suit for protection, and the trial court signed an order placing A.J.H. in DFPS's temporary managing conservatorship. After a hearing on January 26, 2017, the trial court signed an order continuing DFPS's appointment as the child's temporary managing conservator. The order also required Mother to comply with DFPS's family service plan and warned her that failure to comply could result in the termination of her parental rights.

When A.J.H. was released from the hospital in February, he was placed in a foster home in Galveston. The same month, DFPS provided Mother with a family service plan. In March, the family service plan was approved by the court and made a part of the trial court's orders.

In June 2017, Mosely was charged with injury to a child in connection with A.J.H.'s January 2017 burn injury.

In October 2017, the trial court signed an order establishing that, based on a paternity test, one D.G. was A.J.H.'s biological father.

***The Trial***

On January 9, 2018, trial commenced. Before testimony began, DFPS offered 15 exhibits, including the removal affidavit, the transcript from the January 26, 2017 show-cause hearing, the February 17, 2017 family service plan, Mosely's criminal record, and A.J.H.'s medical records from the July 2016 and January 2017 hospitalizations. DFPS announced that the agency's goal at that point was reunification. The ad litem was not comfortable with that plan.

*Micaya Pugh's testimony*

DFPS caseworker, Micaya Pugh, testified that, at the time of trial, A.J.H. was three years old and was in a foster home that was meeting his physical and emotional needs. He came under DFPS's case due to burns and a liver laceration caused by Mosely. Pugh testified that the child was discharged from the burn clinic in June

8

2017 and was "doing really great now." He is in daycare now and is developing normally.

Pugh testified that Mother had a family service plan that required her to complete a psychosocial exam, parenting classes, counseling, independent living, and a sustained job. According to Pugh, Mother did everything required by her family service plan.

Pugh testified that, during DFPS's investigation, it discovered the July 2016 hospitalization. Pugh acknowledged that the ad litem's issue with returning the child was that Mother did not follow up after learning of A.J.H.'s elevated liver enzymes during the 2016 hospitalization.

Pugh testified that, when A.J.H was discharged from the hospital after the burns, Mother remained in the home with Mosely for a short while before moving out. She also discussed Mosely's criminal record, including a juvenile charge for capital murder with aggravated robbery (which was later reduced) and several convictions for marihuana possession. She also acknowledged Mosely's long history of marihuana use.

Push testified that Mother had been living with her mother and sister, but that two weeks before trial, she was able to move into her own apartment. She had broken a lease when she moved out of the apartment with Mosely and found it difficult to get another lease. She also testified that Mother had been working

9

consistently from 7 a.m. to 3 p.m., but that recently she was working longer hours because someone at work had quit.

Pugh acknowledged that, after being afraid of men and bathtubs for a while, A.J.H. was "a normal two-, almost three-year-old" and that he was "thriving" in his foster home. The foster parents love him and want to adopt him. Pugh agreed that, if Mother's parental rights were terminated, it would be in A.J.H.'s best interest for his foster family to adopt him.

When questioned by Mother's attorney, Pugh agreed that DFPS had "no evidence that suggests that Mom knew that the boyfriend had a propensity to harm that child."

Pugh also stated that Mother had attended "every one of [her scheduled] visits" with A.J.H., and that he was "bonded not only with the mom but also the grandmother." Pugh concluded that she believed it was in A.J.H.'s best interest that he be reunited with his mother.

When questioned by the trial court, Pugh stated that Mother was living with Mosely at the time of the July 2016 hospitalization. Mother had initially told Pugh that Mosely was never violent, but "[l]ater on, she did tell me that he had—they would get in arguments, and he would get, like, a little violent with her." Mother claimed to know little about Mosely's criminal record, but since he was apparently out on bond for 60 days on a failure-to-stop-and-give-identification charge and

marihuana possession charge while he was dating Mother, Pugh acknowledged that "[s]he very well could have been dishonest with me." Pugh stated the Mother had no criminal history and no CPS history.

*Mother's testimony*

Mother testified that, when she took A.J.H. to the hospital in July 2016, he was diagnosed with a stomach virus. She said that the hospital did not tell her that A.J.H also had elevated liver enzymes. She stated that, she usually used her mother and sister as babysitters, but she had left the child with Mosely "five times or so." She acknowledged that Mosely smokes marihuana, but that he "always does it outside the house." When asked why she left a child with someone who uses marihuana on a regular basis, Mother replied, "I didn't expect him to do it while my child was in his care."

Regarding Mosely's criminal history, Mother testified that she only knew about one offense: "It was something with robbery when he was 15." She denied knowing about his marihuana charge in March of 2016, even though they had been together for several months by then. When confronted about the 60 days he was sent to jail on the marihuana and failure-to-ID charges in March 2016, Mother acknowledged that there was a period of time during which Mosely was gone for a while, but she never asked him why. When he returned, they soon moved in together.

11

About the follow-up after the July 2016 hospitalization, Mother testified that the doctor said that he would call to follow up, which he did. Mother said that she reported that A.J.H. was still not eating, and that her mother took A.J.H. back to the hospital for a follow up because she was working.

Mother testified that she stayed with Mosely "only a few days" after A.J.H. was burned because "she didn't feel comfortable living there anymore." She has not visited Mosely since. She testified that she did not know that Mosely had a propensity to harm her child before he suffered the burns. Mother denied any knowledge that A.J.H. had problems in his abdominal area during both hospitalizations. She claimed to have learned about the abdominal issues for the first time at court and that she thought that the first hospitalization was caused by a "stomach virus," and the second was "just burns."

*Conclusion of First Day of Trial*

At the conclusion of the first day of trial, the trial court stated:

But I don't see—I mean, you know, there really isn't any evidence that I can point to that would say, well, she knew—she knew that the guy—that leaving the child with him was a dangerous thing. But there's a lot of evidence, in my mind, that says that she should have known. She simply didn't ask questions. She didn't want to know. She didn't want to know the man's background. She didn't—she wasn't honest with the caseworker about his propensity for violence. She didn't tell the truth, at first, about it. So she chose to ignore the possibility. So the question really becomes is the should have known the same as that she knows. And that's really kind of the issue.

12

The trial court then recessed the case, stating that it needed to look at the medical records and that it was "going to be very thorough in looking at those records."

On February 13, 2018, the trial resumed. DFPS re-offered Exhibit 12, the Texas Children's Hospital records, to include the complete medical records, not just the excerpts offered previously. DFPS also provided expert testimony by Dr. Michelle Ruda, a child-abuse pediatrician who had reviewed all of A.J.H.'s medical records.

Ruda noted that A.J.H. presented at Texas Children's Hospital in July 2016 for vomiting, at which time the ER physician noted elevated liver enzymes and bruising to the child's abdomen. Ruda testified that she would have been concerned about physical abuse at that time and "would have consulted a social worker and made a CPS report at the time." She noted that no such CPS report was made. She testified that "usually kids with abdominal injuries like that present right away" and that "it does sound like they were acute injuries." She noted that Mother was recommended to follow up with a gastroenterologist after discharge, but that Mother did not do so. She stated that a child with high liver enzymes "could potentially get very sick," and that a parent who did not follow up with a liver issue "could be considered endangering the child's welfare."

Ruda testified that the abdominal injuries six months later, at the time A.J.H. was burned, were very similar to the earlier liver issues. She would consider the injuries to the abdominal area physical abuse and that a parent should notice those types of injuries. She also testified that not noticing or pretending not to notice the abdominal bruising could endanger the child's life in not taking action.

Ruda acknowledged that an abdominal ultrasound was done in July 2016 and that no injuries were found, but stated that "[u]ltrasound is not the best study to look for abdominal injuries." Ruda noted that the doctor's differential diagnosis indicated potential child abuse, but that no CPS referral was made, and that there should have been one. Ruda concluded that the workup for July 2016 was "very inadequate" and acknowledged that "there wasn't any clear and convincing evidence from [her] our part—from [her] perspective to conclude one way or the other, based on the records at that time [July 2016], that there was an abuse on this child[.]" Ruda concluded, "I would think there would be abuse on this kid but they didn't do the right test to look for the injury." She noted that there was nothing in the medical records to indicate that the hospital told Mother that the July 2016 incident was caused by "a virus."

*Conclusion of Second Day of Trial*

DFPS stated "while [we] initially wanted to return this child, after further discussion that [we] are in favor of termination at this point in time." Counsel

stated that "[t]he doctor's testimony is sufficient to rise to the level of clear and convincing evidence that this child has been abused twice and Mom should have known." The trial court agreed, holding that "Mother's parental rights are terminated under 161.001(b)(1)(D), 1(E) and 1(O)."

This appeal followed.

## SUFFICIENCY OF THE EVIDENCE

In issues one through three, Mother challenges the sufficiency of the evidence to support termination under (1) Family Code sections 161.001(1)(D) (endangering conditions) and (E) (endangerment), (2) Family Code section 161.001(1)(O) (failure to comply with court order), and (3) Family Code section 161.001(2) (finding that termination of Mother's parental rights was in child's best interest).

### *Applicable Law and Standard of Review*

A parent's rights to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). Therefore, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). However, "the rights of natural parents are not absolute" and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*,

15

113 S.W.3d 355, 361 (Tex. 2003). Recognizing that a parent may forfeit his or her parental rights by their acts or omissions, the primary focus of a termination suit is protection of the child's best interests. *Id.*

In a case to terminate parental rights by DFPS under section 161.001 of the Family Code, DFPS must establish, by clear-and-convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and that (2) termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001. Clear-and-convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007; *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). "Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *A.V.*, 113 S.W.3d at 362.

In a legal-sufficiency review in a parental-rights-termination case, the appellate court should look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *J.F.C.*, 96 S.W.3d at 266. We assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so, disregarding all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.* If, after conducting a legal

16

sufficiency review of the record, we determine that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then we must conclude that the evidence is legally insufficient. *Id.*

In conducting a factual-sufficiency review in a parental-rights-termination case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a factfinder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (quoting *J.F.C.*, 96 S.W.3d at 266).

***Sufficiency of the evidence of endangerment by environment or conduct***

In her second issue, Mother contends that the evidence is legally and factually insufficient to support the trial court's termination of her parental rights under Family Code section 161.001(1)(D) (endangering conditions) and (E) (endangerment).

17

Section 161.001(1)(D) provides that a "court may order termination of the parent-child relationship if the court finds by clear and convincing evidence . . . that the parent has . . . knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" TEX. FAM. CODE ANN. § 161.001(1)(D). Section 161.001(1)(E) requires the trial court to find by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id.* § 161.001(1)(E). "To endanger means to expose a child to loss or injury or to jeopardize a child's emotional or physical health." *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) (internal quotation omitted).

A child is endangered under subsection (D) when the environment creates a potential for danger that the parent is aware of but disregards. *Id.* at 721; *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.). Under subsection (D), we examine evidence related to the environment of the child to determine if the environment was the source of endangerment to the child's physical or emotional well-being. *Ruiz v. Tex. Dep't of Family & Protective Servs.*, 212 S.W.3d 804, 815 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *see also In re D.J.J.*, 178 S.W.3d 424, 429 (Tex. App.—Fort Worth 2005, no pet.) ("The phrase

18

'conditions or surroundings' in section 161.001(1)(D) refers only to the acceptability of the child's living conditions and does not concern the conduct of the parents toward the children."). Although the parent need not have certain knowledge that an actual injury is occurring, under subsection D, the parent must at least be aware of the potential for danger to the child in such an environment and must have disregarded that risk. *In re A.S.*, 261 S.W.3d 76, 83 (Tex. App.—Houston [14th Dist.] 2008, pet. denied).

Under subsection (E), the relevant inquiry is whether evidence exists that a parental course of conduct endangered the child's physical or emotional well-being. *In re R.D.,* 955 S.W.2d 364, 368 (Tex. App.—San Antonio 1997, pet. denied). Subsection 161.001(1)(E) asks whether "the endangerment of the child's physical well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act." *In re M.T.W.*, 2011 WL 6938542, at *12 (quoting *In re J.T.G.,* 121 S.W.3d at 125). Termination under subsection (E) must be based on more than a single act or omission—the evidence must demonstrate a voluntary, deliberate, and conscious course of conduct by the parent. *Jordan,* 325 S.W.3d at 723; *see also In re T.T.F.,* 331 S.W.3d 461, 483 (Tex. App.—Fort Worth 2010, no pet.); *see also In re M.T.W.,* 2011 WL 6938542, at *12.

Because the evidence concerning these two statutory grounds for termination is interrelated, an appellate court may consolidate its examination of the evidence

19

for both grounds. *See In re M.T.W.,* 2011 WL 6938542, at \*13; *see also In re J.T.G.,* 121 S.W.3d at 126.

*Analysis*

As Mother states in her brief, "the trial focused on whether [Mother] knew or should have known Mosely was capable of severely harming [the child]." Mother argues that "[o]n the face of this record no rational fact finder could form a firm belief or conviction that [Mother] was aware that [Mosely] had a propensity for injuring children." Primarily, Mother argues that "the relevant [hospital records from the child's July 2016 hospitalization] reflect the doctors at TCH *did* suspect possible child abuse; performed the required tests; and concluded [that] making a CPS referral was not warranted," noting that there was "[n]o concern for abuse at this time." Essentially, Mother argues that, because the hospital never told her that it suspected child abuse and concluded that a CPS referral was "not warranted," the trial court had no basis for finding that Mother knew that leaving the child with Mosely was dangerous.

However, this Court has held that "failure of a medical provider to identify abuse does not establish that a parent does not know that child is in an endangering environment." *In re L.M.M*, 522 S.W.3d 34, 44 (Tex. App.—Houston [1st Dist.] 2017, pet. denied); see also *In re J.P.B.*, 180 S.W.3d 570, 574 (Tex. 2005) ("While it is true that Lonnie sought medical care for J.P.B. multiple times and that J.P.B.'s

20

doctors initially failed to diagnose the fractures, that evidence does not negate the jury's finding that Lonnie knowingly permitted J.P.B. to remain in a setting that was dangerous to his physical well-being."). Thus, we look to the remaining evidence to determine whether it is sufficient to show that Mother was aware that leaving A.J.H. with Mosely would endanger the child.

Upon admission to Texas Children's in July 2017, Mother claimed that A.J.H. became sick and began vomiting after eating a hamburger at McDonald's. She had no explanation for the bruises on his abdomen, back, and ear, other than that he had fallen asleep on a jacket with wooden buttons and that "he bruises easily." The trial court found Mother's statements unbelievable, noting that she had offered "three excuses for why this kid is hurt." As factfinder, the trial court was not required to believe Mother's statement that she didn't know how A.J.H. received the bruises or her explanations for his illness. *See In re J.P.B.*, 180 S.W.3d 570, 574 (Tex. 2005) ("It was within the [factfinder's] province to judge [appellant's] demeanor and to disbelieve his testimony that he did not know how [the child] was injured."). Mother's statement that A.J.H. "bruises easily" could be seen as a statement that she had noticed bruising on the child in the past. However, at a show-cause hearing in January 2017, while A.J.H. was still in the hospital after the scalding incident, Mother testified that she did not even know about any bruises seen during the first hospitalization, in direct contradiction of the medical records showing that she

21

discussed the bruises with the doctors and offered the "bruises easily" and "slept on a wooden button" explanations.

Mother's explanation about whether she knew to follow-up with a gastrointestinal [GI] doctor after the child's discharge in July 2016 also presents credibility issues. Mother testified that she was told only that the child had a virus and that the hospital would call to follow-up. She said that when the hospital called to follow-up, she reported that A.J.H. was still not eating. She claimed that the child's grandmother took A.J.H. back to Texas Children's Hospital to a follow-up appointment. Mother denied any knowledge of abdominal issues or that she was told to take the child to a GI doctor. Again, Mother's testimony is contradicted by the medical records. The discharge documentation portion of the records provides: "Discharge Teaching: Patient/Caregiver Verbalizes Understanding; Provided copy of AVS [after-visit summary]; follow-up appointment scheduled[.] Referral to GI[.]" From this information, the trial court could have disbelieved Mother's testimony that she knew nothing about the need to follow-up regarding A.J.H.'s abdominal issues. This documentation in A.J.H.'s medical records provides evidence that Mother was told in an after-visit summary that she was being referred to a GI doctor, but that she chose not to take him. The trial court could have also disbelieved Mother's statement that the grandmother took A.J.H. to a follow-up visit because the hospital records show no such visit.

There was also evidence that, even after the child was severely burned while in Mosely's care, Mother refused to believe that Mosely could be responsible. The medical records from the second hospitalization show that "when asked privately [Mother] denies having concerns about abuse[.]" And, again, at the show-cause hearing in January 2107, Mother testified, "I just don't believe [Mosely] would do anything intentionally to hurt [A.J.H.]." She also testified that, possibly, the child turned on the scalding water himself, stating, "[W]hen I bathe [A.J.H] he usually reach for the knob. And he know how to turn the knob hisself [sic]." So when—I said that when [Mosely] left him unattended, maybe he did turn the knob. I don't know. I wasn't there."

Mother also provided prevaricating testimony regarding Mosely's propensity for violence and his criminal record. At the January 2017 show cause hearing, Mother testified that "[Mosely] never intentionally harmed me or [A.J.H]." However, Mother also gave conflicting statements to DFPS about Mosely's tendency toward violence. During the caseworker's testimony, the following exchange took place:

Q: But did you ask her if the boyfriend had a violent nature or temper, anything like that?

A: Yes, I did ask her—

Q: What did she tell you?

A:—that multiple times throughout the case. And, at first—

23

Q: Well I'm just talking about this period when you're first meeting her.

A: Okay. So, at first, nothing. She told me he didn't have any kind of violent—

Q: Did she ever change her mind about that?

A: Yes. Later on, she did tell me that he had—they would get in arguments, and he would get, like, a little violent with her.

Based on Mother's conflicting statements regarding Mosely's propensity for violence, the trial court could have believed Mother's statement that appellant got "a little violent with her" when they argued and disbelieved her statement that Mosely never intentionally harmed her.

The same prevarication is shown in Mother's testimony about Mosely's criminal record. Mother admits that she knew about "something with robbery when [Mosely] was 15,"[5] but she denied knowledge of any other criminal convictions. However, the record shows that in March 2016, the month before he moved in with Mother, Mosely was arrested again for failure to ID and possession of marihuana, and sentenced to 60 days' confinement. Mother claimed that she was aware that Mosely was gone for a period of time before they moved in together, but she never asked him where he was and took him back right away when he showed up again.

---

[5] The record shows that the initial charge was for capital murder, which was reduced because Mosely "gave up" another offender.

The trial court could have disbelieved Mother's protests that she was unaware of Mosely's conviction and confinement during the month before they moved in together. Mother claims, however, that even if she were aware that Mosely had been convicted of marihuana possession, that would not put her on notice that that he had a propensity for violence. If, however, she was untruthful about her knowledge of Mosely's criminal convictions, that would reflect on her credibility in general.

Here, there was sufficient evidence that Mother knew that leaving A.J.H. with Mosely would endanger the child. Twice the child was taken to the emergency room with vomiting and abdominal bruises, but, even after the second injury, in which the child was also scalded, Mother claimed that Mosely was not violent and that it was an accident. Mother's claim that she did not know that Mosely was violent was in direct contravention of her statement to the caseworker that, when they argued, Mosely would become violent with her.

When confronted with A.J.H.'s bruises at the July hospital visit, Mother gave several incredible reasons for them, and later she claimed not to remember that he had any bruises at all. Mother then did not follow up with the recommended GI doctor, which could have revealed the source of A.J.H.'s July abdominal issues. She claimed to not know about his abdominal issues, even though the child's discharge information says that she was so informed. Based on Mother's statements, many of which conflicted with the medical records, the trial court could have concluded that

Mother knew of Mosely's propensity for violence, but left A.J.H. with him as many as five times, including the time he was scalded and ultimately removed from the home.

In sum, we conclude that a reasonable factfinder could have formed a firm belief or conviction that Mother had endangered A.J.H. and/or left him in endangering conditions. Likewise, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding was not so significant that a factfinder could not reasonably have formed a firm belief or conviction that Mother had endangered A.J.H. and/or left him in endangering conditions. Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's termination findings under subsections (D) and (E).

We overrule issue Mother's first issue. In light of our disposition, we need not address her second issue, in which she argues that the evidence is legally and factually insufficient to terminate her parental rights under subsection (O). *See A.V.*, 113 S.W.3d at 362. ("Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest.")

*Sufficiency of the evidence regarding best interest of the child*

In issue three, Mother contends that there is legally and factually insufficient evidence that termination of her parental rights was in the best interest of the child.

As a matter of public policy, "the best interest of a child is usually served by maintaining the parent-child relationship." *J.F.C.*, 96 S.W.3d at 294. Despite this important relationship, the Texas Supreme Court has held that "protection of the child is paramount" and "the rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *A.V.*, 113 S.W.3d at 361.

Appellate courts examine the entire record to decide what is in the best interest of the child. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). There is a strong presumption that the best interest of a child is served by preserving the parent-child relationship. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In assessing whether termination is in a child's best interest, the courts are guided by the non-exclusive list of factors set forth in *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger to the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not proper, and (9) any excuse for the acts or omissions of the parent. *Id.* "[T]he State need not prove all of the factors as a condition precedent to parental

termination, 'particularly if the evidence was undisputed that the parental relationship endangered the safety of the child.'" *In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied) (quoting *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002)).

The Texas Family Code also provides a list of relevant considerations:

§ 263.307 Factors in Determining Best Interest of Child

(a) In considering the factors established by this section, the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest.

(b) The following factors should be considered by the court and the department in determining whether the child's parents are willing and able to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

(A) minimally adequate health and nutritional care;

(B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

(C) guidance and supervision consistent with the child's safety;

(D) a safe physical home environment;

(E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

(F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.

TEX. FAM. CODE ANN. § 263.307.

For purposes of determining legal sufficiency, we consider those factors that support the finding that termination was in the child's best interest. *Yonko v. Dep't of Family & Protective Servs.*, 196 S.W.3d 236, 243 (Tex. App.—Houston [1st Dist.] 2006, no pet.). If the evidence is legally sufficient, we then balance the factors presented in the legal sufficiency argument against the evidence that undercuts any finding that termination is justified under the statute. *C.T.E.*, 95 S.W.3d at 467. We consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *J.F.C.*, 96 S.W.3d at 266. If, after considering the entire record, the disputed evidence that weighs against termination is so significant that a factfinder could not reasonable have formed a firm belief or conviction that termination was justified, then the evidence is factually insufficient to support termination. *Id.* A court of appeals should detail in its opinion why it has concluded that a reasonable factfinder could not have credited disputed evidence in favor of termination. *Id.* at 266–67.

*Desires of the Children*

A.J.H. was too young at the time of trial to express his desire. However, there was testimony that he was bonded with Mother and Grandmother. "Where the evidence of the parent's failures is not overwhelming, the desires of the child weigh against termination of parental rights." *Yonko*, 196 S.W.3d at 245. Nevertheless, we note that the child's young age may weigh in favor of the best-interest finding. *See*

*In re J.M.T.*, 519 S.W.3d 258, 270 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (citing Tex. Fam. Code Ann. § 263.307(b)(1)). This factor is neutral at best or weighs in favor of termination given the child's vulnerable age.

*Emotional and Physical Needs of and Danger to the Children*

The same evidence that supports the trial court's findings regarding subsections (D) and (E), as detailed above, is also relevant to a sufficiency review of the best-interest finding. *C.H.*, 89 S.W.3d at 28 (holding same evidence may be probative of both § 161.001(b)(1) and best-interest grounds). We also note that, even though Mother is no longer living with Mosely, her parental behavior of leaving her child with a dangerous caregiver would likely pose a danger to the child in the future. *See Castorena v. Tex. Dep't of Protective and Regulatory Servs.*, No. 03-02-00653-CV, 2004 WL 903906, *10 (Tex. App.—Austin Apr. 29, 2004, pet. denied) ("[A] fact finder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent."). This factor weighs in favor of termination.

*Parental Abilities of the Mother*

Here, there was evidence that Mother cared for the child and sought emergency care for him when he was sick. She also worked a full-time job to support him. However, on several occasions, she left him with Mosely, a man whom she knew was "a little violent" with her when he was angry with her. As such, she

31

knowingly permitting A.J.H. to remain in a setting that was dangerous to his well-being. This factor weighs in favor of termination.

*Programs Available to the Mother*

Mother was offered and completed parenting classes as a part of the family plan that DFPS gave her. This factor weighs against termination.

*Plans for the Children by DFPS*

There was testimony that A.J.H. was doing very well in his foster home and that the foster parents wished to adopt him. He was developing normally and the foster family was meeting all of his needs. A.J.H. was no longer afraid to take baths and was becoming very vocal and thriving, whereas before he was quiet and would not talk when something was wrong. This factor weighs in favor of termination.

*Mother's Acts or Omissions*

Mother's failure to protect A.J.H. from Mosely is detailed above, and this factor weighs in favor of termination.

*Excuses for Mother's Acts or Omissions*

Mother offered no excuse for leaving A.J.H. with Mosely, other than that it was cold out and she did not want to take him on the bus. Mother also defended Mosely and claimed that she did not believe that he would intentionally hurt A.J.H. Even when the child was scalded while in Mosely's care, Mother suggested that the

32

child might have turned on the hot water himself. This factor weighs in favor of termination.

Our review of the *Holley* and statutory factors above shows that, viewing the evidence in a light favorable to the trial court's findings, a factfinder could have formed a firm belief or conviction that it was in A.J.H.'s best interest to terminate the Mother's parental rights. *See In re J.F.C.*, 96 S.W.3d at 266. Likewise, the disputed evidence that weighs against termination is not so significant that a factfinder could not reasonably have formed a firm belief or conviction that termination was in A.J.H.'s best interest. As such, the evidence is legally and factually sufficient to support the best interest finding.

Accordingly, we overrule Mother's third issue.

## SOLE MANAGING CONSERVATORSHIP

In her fourth issue, Mother contends the evidence is legally and factually insufficient to support the appointment of DFPS as sole managing conservator of the child.

The Family Code creates a rebuttable presumption that a parent will be named the child's managing conservator unless the court finds that such appointment would not be in her best interest "because the appointment would significantly impair the child's physical health or emotional development." TEX. FAM. CODE ANN. § 153.131(a). However, the Family Code also provides: "If the court terminates the

33

parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, [DFPS], or a licensed child-placing agency as managing conservator of the child." *Id.* § 161.207(a); *see also In re S.M.G.*, No. 01-17-00056-CV, 2017 WL 2806332, at *8 (Tex. App.—Houston [1st Dist.] June 29, 2017, pet. denied) (mem. op.) ("When the parents' parental rights have been terminated, Family Code section 161.207 governs the appointment of a managing conservator."); *In re M.M.M.*, No. 01-16-00998-CV, 2017 WL 2645435, at *17 (Tex. App.—Houston [1st Dist.] June 16, 2017, no pet.) (mem. op.) (parental presumption applies only when parental rights not terminated).

In this case, the trial court appointed DFPS as sole managing conservator of A.J.H. after terminating Mother's parental rights. Termination of parental rights and appointment of a non-parent as sole managing conservator are two distinct issues, requiring different elements, different standards of proof, and different standards of review. *Compare* TEX. FAM. CODE ANN. § 161.001, *with id.* § 153.131(a); *see also In re J.A.J.*, 243 S.W.3d 611, 615–17 (Tex. 2007). Unlike the standard of proof for termination of parental rights, the findings necessary to appoint a non-parent as sole managing conservator need only be established by a mere preponderance of the evidence. *See* TEX. FAM. CODE ANN. § 105.005; *In re J.A.J.*, 243 S.W.3d at 616.

Likewise, the standard of review for the appointment of a non-parent as sole managing conservator is less stringent than the standard of review for termination of

parental rights. *In re J.A.J.*, 243 S.W.3d at 616; *In re A.C.*, 394 S.W.3d 633, 644 (Tex. App.—Houston [1st Dist.] 2012, no pet.). We review a trial court's appointment of a non-parent as sole managing conservator for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d at 616; *Earvin v. Dep't of Family & Protective Servs.,* 229 S.W.3d 345, 350 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Therefore, we reverse the trial court's appointment of a non-parent as sole managing conservator only if we determine that the appointment is arbitrary or unreasonable. *In re J.A.J.*, 243 S.W.3d at 616; *Earvin*, 229 S.W.3d at 350. We view the evidence in the light most favorable to the trial court's decision and indulge every legal presumption in favor of its judgment. *Earvin*, 229 S.W.3d at 350. A trial court abuses its discretion by ruling without supporting evidence. *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012).

An order terminating the parent-child relationship divests a parent of all legal rights and duties with respect to the child. *See* TEX. FAM. CODE ANN. § 161.206(b). Here, having made termination findings on the predicate grounds found in Family Code section 161.001(b)(1) and best interest, the trial court was required under section 161.207 to appoint DFPS, or another permissible adult or agency, as the child's managing conservator. *See In re L.G.R.*, 498 S.W.3d 195, 207 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *see also In re S.M.G.*, 2017 WL 2806332,

35

at *8 (when parental rights terminated section 161.207 controls appointment of managing conservator).

As discussed above, the evidence is legally and factually sufficient to support the trial court's termination of Mother's parental rights to the children. *See In re S.R.*, 452 S.W.3d 351, 359 n. 3 (Tex. App.—Houston [14th Dist.], 2014, pet. denied) ("A trial court does not abuse its discretion in appointing [DFPS] as conservator of the children where the evidence is sufficient to support termination of parental rights."). Because we have overruled Mother's challenge to the portion of the trial court's order terminating her parental rights, the order has divested her of her legal rights and duties related to the child. *See* TEX. FAM. CODE ANN. § 161.206(b); *In re L.M.N.*, No. 01-18-00413-CV, 2018 WL 5831672, *25–26 (Tex. App.—Houston [1st Dist.] Nov. 8, 2018, no writ); *E.A. v. Tex. Dep't of Family & Protective Servs.*, No. 03-15-00811-CV, 2016 WL 1639847, at *4 (Tex. App.—Austin Apr. 21, 2016 pet. denied). Mother now lacks standing to challenge the appointment of DFPS as the children's permanent managing conservator. *See L.M.N.*, 2018 WL 5831672, at *26; *In re C.E.C.*, No. 05-17-01482-CV, 2018 WL 3062454, at *8 (Tex. App.—Dallas June 21, 2018, no pet.) (mem. op.); *In re D.K.W., Jr.*, No. 01-17-00622-CV, 2017 WL 6520439, at *5 (Tex. App.—Houston [1st Dist.] Dec. 21, 2017, pet. denied) (mem. op.); *see also Quiroz v. Dep't of Family & Protective Servs.*, No. 01-08-00548-CV, 2009 WL 961935, at *11 (Tex. App.—Houston [1st Dist.] Apr. 9, 2009, no pet.)

(mem. op.) (refusing to address parent's complaint evidence insufficient to support DFPS's appointment as sole managing conservator when evidence sufficient to support termination of parent's rights).

Accordingly, we overrule Mother's fourth issue.

## CONCLUSION

We affirm the trial court's judgment.


Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Higley and Lloyd.